# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 21-2098V

| | |
|---|---|
| DANA GRANVILLE,<br><br>      Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: August 30, 2023<br><br>Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Influenza (Flu) Vaccine; Guillain-Barré Syndrome (GBS) |

*John Robert Howie*, Howie Law, PC, Dallas, TX, for Petitioner.

*Sarah Black Rifkin*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION AWARDING DAMAGES[1]

On October 28, 2021, Dana Granville filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered from Guillain-Barré syndrome ("GBS") as a result of an influenza ("flu") vaccine she received on December 3, 2019. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters, and although Respondent conceded entitlement, the parties were not able to settle damages.

After hearing argument from the parties at a "Motions Day" proceeding, I find that Petitioner is entitled to an award of damages in the amount of **$96,008.66, representing $92,500.00 in actual pain and suffering, and $3,508.66 in unreimbursed out-of-pocket expenses.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I.     Relevant Procedural History

Nearly a year after the claim's initiation, Respondent filed a Rule 4(c) Report conceding entitlement. ECF No. 19. However, the parties quickly determined that they could not resolve damages on their own. ECF No. 22. Petitioner therefore filed a Damages Brief ("Br.") on October 19, 2022. ECF No. 26. Respondent filed a responsive brief ("Resp.") on November 22, 2022, and Petitioner filed a reply brief ("Repl.") on December 9, 2022. ECF No. 27-28. I proposed that the parties be given the opportunity to argue their positions at a "Motions Day" hearing, at which time I would decide the disputed issues. ECF No. 29. That hearing was held on August 25, 2023, and the case is now ripe for resolution.

Petitioner argues that an award of $95,000 in past pain and suffering, plus unreimbursed out-of-pocket expenses of $3,508.66, is appropriate. Br. at 2. In making her request, Petitioner acknowledges that her GBS course was mild, but highlights the seriousness of GBS as an injury. *Id.* at 19. Although Petitioner recovered quickly and did not suffer from serious complications, her GBS still required a hospital stay, with IVIG treatment, and significantly disrupted her life. *Id.* at 20.

Respondent, by contrast, proposes the lesser sum of $52,500.00 as appropriate because "Petitioner's course was unquestionably mild." Resp. at 5. Respondent notes that, after her hospitalization, "Petitioner's outpatient treatment was limited" and she enjoyed a "rapid recovery." *Id.* Respondent does not dispute Petitioner's out-of-pocket expenses calculation, however. *Id.* at 2, footnote 1.

## II.     Relevant Medical History

Petitioner was 28 years old and in good health when she received an influenza vaccination on December 3, 2019. Ex. 2 at 1. She visited her primary care provider ("PCP") on December 16, 2019 (13 days after her vaccination), reporting that, for the previous day or two, her hands felt cold and that she had a tingling and numb sensation down her arms and into her hands. Ex. 3 at 120-125. The doctor diagnosed chronic neck pain, prescribed a muscle relaxant, and referred Petitioner to physical therapy. *Id.* at 125.

Petitioner's symptoms worsened to include numbness in her feet which then spread up into her legs, groin, and buttocks, which made walking difficult. Ex. 1 at ¶7. She also experienced tingling in her tongue. *Id.* She returned to her PCP on December 19, 2019. Ex. 3 at 126-132. An MRI was scheduled for the following morning and Petitioner was prescribed prednisone. *Id.* at 133.

On December 20, 2019, cervical and thoracic MRIs were normal. Ex. 3 at 779. Petitioner returned to her PCP that day who referred her to the emergency room for a lumbar puncture. *Id*. at 150-51. In the emergency room, Petitioner was given a lumbar puncture, which revealed elevated CSF protein and glucose, and was admitted with a diagnosis of GBS. Ex. 8 at 31-33.

Petitioner was hospitalized from December 20 to December 24, 2019 (5 days) and received five IVIG infusions. Ex. 8 at 12, 60. Petitioner experienced some complications from her IVIG infusions, including gastrointestinal symptoms, headaches, tachycardia, and chest pain. Ex. 8 at 52-53; 55-59. During her hospitalization, she complained of numbness and tingling in her hands, feet, legs, groin and tongue, and weakness in her legs, however the weakness was not demonstrable on exam. *Id*. at 27, 40. Petitioner did not require a swallow study and improved throughout her stay. *Id*. at 151. By discharge, she reported only that she felt "a little unsteady on her feet." *Id.* at 66. Her exam was mostly normal, but with absent reflexes. *Id*. at 67. She was discharged home with no medications. *Id*. at 14, 60.

On January 8, 2020, Petitioner returned to her PCP for a follow up visit. Ex. 3 at 155. She reported that her feet were still numb and her fingers felt "tingly." *Id*. at 156. Petitioner did not feel ready to return to work because she worked with scissors and sewing machines and worried about cutting herself. *Id*. at 156. The doctor excused her for work for 1.5 weeks and referred Petitioner for occupational therapy. *Id*. at 158

Petitioner returned to her PCP on January 16, 2020. Ex. 3 at 164. She reported numbness and tingling in her hands, feet, and nose. *Id*. at 165. Petitioner related some lower back pain to her lumbar puncture. *Id.* She requested permission to return to work part-time and asked whether she needed continuing care from specialists because she was feeling better. *Id*. at 165. The doctor "insist[ed] that she follow up with neurology," and encouraged her to start occupational therapy, but cleared her to return to work for four hour shifts so long as she was given the use of a chair at work. *Id*. at 165-68. The following day, Petitioner called to ask if her doctor could amend his note to clear her to drive (as her neurologist had previously told her not to drive due to the decreased feeling in her feet.). Ex. 3 at 173. After some follow up questions, Petitioner was allowed to drive. *Id*. at 174.

On January 21, 2020, Petitioner presented for an initial occupational therapy evaluation. Ex. 3 at 177. She now reported being independent with all activities of daily living. *Id*. at 178. She reported her GBS diagnosis, headaches that were improving, neck pain for which she was pursuing physical therapy, and numbness that was worst in the morning but improved within ten minutes. *Id*. She reported that she previously could not crouch down, but now could, and that she held the railing when going up and down stairs,

which had also improved. *Id*. She was driving and working. *Id*. Petitioner was given a home exercise program, but she and therapist agreed that she would not attend formal occupational. *Id*. at 179-80.

On January 27, 2020, Petitioner presented for an initial physical therapy evaluation. Ex. 3 at 196. She reported chronic neck pain, generalized weakness, and "ongoing intermittent to nearly constant" numbness and tingling in her upper and lower extremities and her nose. *Id*. at 197. She reported being able to do her full work duties and daily activities without problem. *Id*. She completed 6 sessions of physical therapy through March 4, 2020 – which focused primarily on headaches and neck pain. *Id*. at 288. By the end of the treatment course, she reported sporadic numbness and tingling, but reported working full 6–8-hour days without accommodation. *Id*. at 288.

On February 24, 2020, Petitioner returned to her neurologist for a follow up visit. Ex. 9 at 8. She reported that she was "doing well, no needs at this time, no signs of recurrence." *Id*. She reported occasional numbness in her hands and feet and said her "nose tingles a little." *Id*. at 9. Her exam was normal. *Id.* at 9-10. Petitioner was advised to avoid the flu shot in the future, but no further treatment was recommended. *Id*.

On July 15, 2020, Petitioner returned to her PCP. Ex. 3 at 312. Petitioner reported still having tingling in her hands, feet, and the side of her lower legs – more at night which sometimes interfered with her sleep. *Id*. at 312-13. She also reported lower back pain since her lumbar puncture. *Id*. The doctor noted Petitioner's "relatively full recovery" from GBS. *Id*. at 312. The doctor discussed prescribing gabapentin or Lyrica for the tingling, but it is not clear whether Petitioner used either medication. *Id*. at 313.

Petitioner has since represented that she has "fully recovered from her GBS," and "no longer experiences any symptoms which she relates to her GBS." Br. at 18.

### III.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with that of my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a decision from several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 589-90. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 593-95. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it offers a reasoned understanding of the issues involved in pain and suffering calculations.

### IV.  Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her GBS. Therefore, my analysis focuses primarily on the severity and duration of Petitioner's injury.

When performing this analysis, I review the record as a whole, including the medical records and affidavits filed, all assertions made by the parties in written documents, and the parties' arguments during the hearing. Petitioner's medical records and affidavits reveal a mild case of GBS, and neither party argues otherwise. Petitioner required a lumbar puncture, a five-day hospital stay, five IVIG infusions, limited outpatient treatment, including one neurologist visit and one occupational therapy evaluation, and enjoyed a quick and full recovery. Nevertheless, GBS injuries are distinguishable from many other kinds of common Program vaccine injuries because it is a particularly frightening type of vaccine injury – and as a result, a higher-than-average pain and suffering award is generally appropriate. *See Gross v. Sec'y of Health & Human Servs.*, No. 19-0835V, 2021 WL 2666685 at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2021).

Petitioner primarily relied on *Geschwindner v. Sec'y of Health & Human Servs.*, No. 17-1558V, 2022 WL 177372 (Fed. Cl. Spec. Mstr. Jan. 28, 2022) to support her request for $95,000 in pain and suffering. The petitioner in *Geschwindner* also had a mild GBS injury, which required a three-day hospital stay, oral prednisone, MRIs, EMG/NCV testing, and eight outpatient physical therapy sessions. *Id.* at *1-3. She did not have IVIG infusions or a lumbar puncture. *Id.* That claimant continued to be treated by a neurologist for approximately eight months after vaccination, when her nerve testing was normal.[3] *Id.* Petitioner argues that her treatment course was similar, but slightly more severe, since she required a longer hospital stay and IVIG infusions, from which she suffered side effects (gastrointestinal symptoms, headaches, tachycardia, and chest pain). Br. at 20-22.

Respondent acknowledged that *Geschwindner* is the most comparable reasoned decision, but argued that Petitioner's treatment course was less severe because that petitioner did not enjoy the quick and full recovery that Ms. Granville enjoyed. Respondent specifically noted that the *Geschwindner* claimant struggled to stand longer than 15-30 minutes after her hospitalization, and required follow-up care from her neurologist for eight months (while Ms. Granville visited her neurologist only once after her hospitalization) and two courses of physical therapy. Although Respondent made valid factual distinctions, he did not provide any real explanation (other than having reviewed

---

[3] The *Geschwindner* petitioner also reported ongoing leg pain for up to two or more years after her vaccination, however, Special Master Oler determined that there was insufficient record evidence to evaluate that claim. *Geschwindner*, 2022 WL 777372 at *7.

6

the universe of proffers and settled cases) for how he quantified the amount of the decrease to his proposed award of $52,500 in pain and suffering. Therefore, I do not find that Respondent has fully defended the lower sum proposed.

While Petitioner's GBS injury was mild overall, it still involved much of the treatment that is routinely seen in GBS cases – including a several-day hospitalization and treatment with IVIG infusions. Although Ms. Granville had a more significant initial treatment course than what was seen in *Geschwindner* – with a longer hospitalization and IVIG treatment, from which she suffered side effects – she enjoyed a faster and easier path to full recovery after treatment. On balance, Ms. Granville's pain and suffering was substantially similar to the petitioner in *Geschwindner*, if slightly less overall. Accordingly, based on the record as a whole, I find that **$92,500.00 in compensation for actual/past pain and suffering** is reasonable and appropriate in this case.

### V.   Award for Past and Future Unreimbursed Expenses

Petitioner requests **$3,508.66 in past unreimbursable expenses**. Br. at 2. Respondent does not dispute this sum, and therefore Petitioner is awarded it without adjustment. Resp. at 2, footnote 1.

### Conclusion

For all of the above reasons, the I award **Petitioner a lump sum payment of $96,008.66 (representing $92,500.00 for Petitioner's actual pain and suffering and $3,508.66 for past unreimbursed medical expenses) in the form of a check payable to Petitioner, Dana Granville.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of Court is directed to enter judgment in accordance with this Decision.[4]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[4] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.